# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# STATESBORO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No. CR606-010 |
| ) | |
| TONY SMITH, a.k.a. RAPP WARE, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Defendant has filed a motion to suppress evidence seized from the vehicle which he used to speed away from a roadblock set up by state officers who were conducting a license check within the city limits of Reidsville, Georgia. Defendant contends that the roadblock contravened the Fourth Amendment because it was conducted for an improper purpose and pursuant to the unfettered discretion of the officers in the field rather than under the direction of appropriate supervisory personnel. The facts adduced at the evidentiary hearing held on February 23, 2007 fail to support these contentions.

I.  **BACKGROUND**

Georgia State Patrol (GSP) Trooper Jay Williams was on patrol duty in Tattnall County on January 21, 2005 when he was instructed by his supervisor to conduct a roadblock on State Road 23 just inside the city limits of Reidsville, Georgia. GSP Sergeant W.D. Lee, the supervisory official who authorized the traffic check, completed a Supervisory Initiation of Roadblock Approval Form scheduling the roadblock to commence shortly before 10:00 a.m. for the purpose of performing a routine check for (1) drivers' licenses, insurance, and registration verification; (2) seatbelt compliance; (3) driver impairment; (4) vehicle fitness and safety compliance; and (5) detection of a dangerous felon likely to take a designated route. Gov't Ex. 2.[1] Trooper Williams testified that during his employment with the GSP he had performed "hundreds" of such roadblocks to ensure motorists' compliance with the state traffic laws. Trooper Williams explained that the GSP roadblock policy permits the officer

---

[1] The Roadblock Approval Form completed by Sgt. Lee lists several potential purposes for the institution of a roadblock, and Sgt. Lee selected each of the above listed reasons as justifications for the roadblock at issue here. See Gov't Ex. 2. Trooper Williams stated that the final reason, the location of a dangerous felon likely to take a designated route, was seldom used as the reason for a roadblock, and he acknowledged that the officers conducting the roadblock were not notified that a felon might be headed in their direction.

2

conducting the roadblock to check each vehicle, every third vehicle, or every fifth vehicle stopped, but mandates that the officer maintain the same vehicle selection process throughout the duration of the roadblock. See Gov't Ex. 1, at 3. Trooper Williams testified that his personal policy is to stop each vehicle that comes upon the roadblock, as this method eliminates the possibility of confusion as to which vehicles are to be checked.

At approximately 10:10 a.m. on January 21, 2005, the traffic checkpoint was well underway when a grey Chevrolet Aveo with two occupants approached the roadblock. Trooper Williams motioned for the driver, Paula Chatman, to pull up to where he was standing and asked that she produce her driver's license and proof of insurance. Ms. Chatman provided her license and indicated that the vehicle was a rental. Trooper Williams then requested the rental agreement for the vehicle. Because the name on the rental agreement did not match the driver's license that Ms. Chatman had provided, Trooper Williams asked Ms. Chatman to pull the vehicle over onto the shoulder so that he could investigate the discrepancy. After she complied with this instruction, Trooper Williams asked Ms. Chatman to step out of the vehicle with her paperwork so that he could

further inquire into the matter. Trooper Williams noticed that Ms. Chatman was extremely nervous and informed her of his observations. She attributed her nervousness to the fact that she was speaking with a law enforcement officer and stated that she was in a hurry and needed to be on her way. Trooper Williams then sought and received consent to search the vehicle from Ms. Chatman.

Prior to conducting a search of the vehicle, Trooper Williams asked Officer Reardon to check the status of the large black male occupying the Aveo's passenger seat, an individual later identified as the defendant. Officer Reardon obtained defendant's license and learned from the central 911 operations center in Tattnall County that the individual was a signal "10-123," a wanted suspect. Officer Reardon then motioned for defendant to step to the rear of the vehicle. Defendant, however, pointed toward the door of the vehicle, indicating that the door would not open. He then slowly began to move from the passenger side of the vehicle into the driver's seat, prompting Officer Reardon to inform Trooper Williams that the passenger was going to be exiting through the driver's side. Rather than exiting the vehicle, defendant started the vehicle's ignition and sped away.

Trooper Williams got into his patrol and gave chase, pursuing defendant for some time before he collided with another vehicle. Some forty-two miles later, Trooper Mark Wright performed a PIT maneuver (an immobilization technique) on defendant's vehicle, which caused the vehicle to spin out and come to a stop. Officers recovered 305.1 grams of crack cocaine from the vehicle, as well as a Mossberg shotgun, a Tanita electronic scale, and some currency.

## II.  ANALYSIS

It is well settled that a vehicle stop at a highway checkpoint constitutes a seizure within the meaning of the Fourth Amendment. City of Indianapolis v. Edmond, 531 U.S. 32, 40 (2000). "The Fourth Amendment imposes limits on search and seizure powers in order to prevent *arbitrary and oppressive* interference by enforcement officials with the privacy and personal security of individuals." United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976) (emphasis added). But while "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure . . . the Fourth Amendment imposes no

irreducible requirement of such suspicion." Id. at 560-61 (citations omitted). Thus, the Court has upheld brief, suspicionless stops of motorists at permanent immigration checkpoints designed to intercept illegal aliens, id. at 545, and at highway sobriety checkpoints to examine drivers for signs of intoxication. Michigan Dep't of State Police v. Sitz, 496 U.S. 444, (1990). Although officers may not *randomly* stop motorists to check their drivers' licenses and registrations, Delaware v. Prouse, 440 U.S. 648, 663 (1979), nothing precludes a state from developing a method for spot checks of vehicles that eliminates "the unconstrained exercise of discretion" on the part of the officers, such as the "[q]uestioning of all oncoming traffic at roadblock-type stops." Id. Such suspicionless seizures, justified by neither probable cause nor reasonable suspicion, must be "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Brown v. Texas, 443 U.S. 47, 51 (1979).

In Edmond, the Court held that a highway checkpoint program established by the City of Indianapolis for the primary purpose of interdicting illegal narcotics violated the Fourth Amendment because it resulted in seizures that were not based upon individualized reasonable

suspicion, a necessary component of any stop whose chief purpose is "to detect evidence of ordinary criminal wrongdoing." Edmond, 531 U.S. at 41. The Court noted that what principally distinguished the types of checkpoints that it had approved in earlier cases was the primary purpose of the checkpoints, which were each designed to serve an important governmental interest other than general crime control, such as policing the border or ensuing roadway safety. Id. at 41-42.[2] In ruling that suspicionless checkpoint stops are constitutional only if their primary purpose is separate from the general interest in crime control, the Supreme

---

[2]"We have . . . upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens, Martinez-Fuerte, [428 U.S. 543], and at a sobriety checkpoint aimed at removing drunk drivers from the road, Michigan Dept. of State Police v. Sitz, 496 U.S. 444 (1990). In addition, in Delaware v. Prouse, 440 U.S. 648, 663 (1979), we suggested that a similar type of roadblock with the purpose verifying drivers' licenses and vehicle registrations would be permissible. In none of these cases, however, did we indicate approval of a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." Edmond, 531 U.S. at 37-38.

In Merrett v. Moore, 58 F.3d 1547 (11th Cir. 1995), the Eleventh Circuit upheld a roadblock whose "chief purpose" was to interdict illegal drugs because the state also had a secondary purpose of checking drivers' licenses and vehicle registration, even though "no roadblock would have been put in place but for the state's desire to hunt for unlawful drugs." Id. at 1548, 1551. The continued validity of this holding is in doubt after the Edmond decision, which squarely held that a highway checkpoint program whose "primary purpose" is to locate illegal drugs violates the Fourth Amendment. 531 U.S. at 34, 44; see id. at 47 n.2 (declining to address a state checkpoint program "with the primary purpose of checking licenses or driver sobriety and a *secondary* purpose of interdicting narcotics.") (emphasis added).

Court explicitly commented that its holding did "nothing to alter the constitutional status of the sobriety and border checkpoints that we approved in Sitz and Martinez-Fuerte or of the type of traffic checkpoint that we suggested would be lawful in Prouse." Edmond, 531 U.S. at 47.

The Georgia State Patrol Policy Manual states that roadblocks "must be conducted pursuant to a plan developed by supervisory personnel that establishes explicit and neutral criteria for all aspects of the road check." Gov't Ex. 1. In this case, the roadblock was established "to perform a routine traffic check[]" in order to verify drivers' licenses, assess vehicle safety and seatbelt compliance, and look for impaired drivers. Gov't Ex. 2. A further listed purpose was the location a dangerous felon likely to take a designated route.[3] Gov't Ex. 2. Thus, the primary purpose of the roadblock was not general crime control but was to advance the state's "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that

---

[3] It is unclear why this particular purpose was listed by the supervisor on the roadblock approval form, for no officer on the scene was told to be on the lookout for a particular felon. The Supreme Court, however, has noted that "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up . . . to catch a dangerous criminal who is likely to flee by way of a particular route." 531 U.S. at 44 (dictum). Thus, the supervisor did not infringe any of defendant's Fourth Amendment rights in listing this additional purpose as a justification for the traffic check.

8

licensing, registration, and vehicle inspection requirements are being observed." Prouse, 440 U.S. at 658.

In addition to the necessity of having a lawful purpose for establishing the roadblock, the officers conducting the roadblock must follow certain procedural rules. Specifically, the officers in the field must not act with unfettered discretion that permits the arbitrary interference with a citizen's right to personal security. Brown, 443 U.S. at 51.; Martinez-Fuerte, 428 U.S. at 554. In this case, the decision to conduct a roadblock was made by a GSP supervisor, not by Trooper Williams or other officers in the field. In addition, the supervisor selected the location, date, and time for the roadblock. Further, the GSP Policy Manual limited the method by which the field officers could select vehicles for a traffic check, requiring that they either check each vehicle, every third vehicle, or every fifth vehicle in a consistent pattern. Gov't Ex. 1, at 3. While it is true that the GSP policy afforded Trooper Williams some discretion as to which vehicles would be checked, none of the approved methods allowed the trooper to conduct the type of random spot checks condemned by the Supreme Court in Prouse, which identified "standardless and unconstrained discretion" as "the evil" the Fourth Amendment is designed to protect against. 440 U.S.

at 661. Thus, the GSP policy for implementing the roadblock effectively eliminated the risk of random stops and appropriately circumscribed the discretion of the officers in the field.

Trooper Williams testified that while his supervisor initiated the roadblock and selected the date, time, and place for it to occur, neither his supervisor nor GSP policy established the duration of the roadblock. The Court invited the parties to submit post-hearing briefs on the question of whether a field officer's power to determine the duration of a roadblock infringes the Fourth Amendment. No case has been cited to the Court which specifically addresses this question. The Court is persuaded, however, that reserving to Trooper Williams the power to determine the duration of the roadblock does not lead to the type of "unconstrained discretion" condemned in Prouse. 440 U.S. at 661. To eliminate "the evil" of random license and safety checks, the Supreme Court requires "that the discretion of the official in the field be circumscribed, *at least to some extent.*" Id. (emphasis added). The courts, however, have not insisted that all discretion be removed from field officers executing a roadblock. Thus, for example, an officer charged with stopping every vehicle does not act improperly if he waves all vehicles through the roadblock when the roadway

becomes too congested. See United States v. Diaz Albertini, 772 F.2d 854, 858 (10th Cir. 1985); United States v. Prichard, 645 F.2d 854, 856-57 (10th Cir. 1981). Similarly, allowing the field officer to determine the duration of the roadblock does not offend the Fourth Amendment since it would not result in motorists being subjected to the type of random, arbitrary stops condemned by Prouse. Indeed, as Trooper Williams testified, it is not always possible for the field officers to control the duration of a roadblock, since the traffic checks may lead to so many arrests that the officers must end a roadblock earlier than expected because their patrol cars are full of arrestees. An early conclusion of a roadblock is precisely what happened in this case when defendant sped from the scene, prompting the officers to interrupt their roadblock and give chase. Because affording field officers discretion as to the duration of roadblock does not result in the random or arbitrary selection of motorists for a traffic check, the reasonableness standard of the Fourth Amendment is not infringed.[4]

---

[4] It is, of course, possible that a roadblock could be prolonged to the point that it unreasonably intrudes upon "motorists' right to 'free passage without interruption . . . and arguably on their right to personal security.'" Martinez-Fuerte, 428 U.S. at 557-58. So, the duration of a roadblock is subject to constitutional limits. But simply allowing the officer in the field to exercise some discretion as to the duration of the roadblock does not in and of itself offend the Fourth Amendment.

11

## III. CONCLUSION

The consistent testimony at the suppression hearing establishes that the roadblock in the instant case was established for the lawful purpose of enforcing the traffic laws of the State of Georgia, and not for some illegitimate purpose such as generalized crime control. Moreover, the roadblock comported with the procedural requirements for a roadblock. Trooper Williams testified that he stopped each and every vehicle that approached the roadblock, using one of the non-random methods authorized by the GSP policy manual. The roadblock was approved by a supervisor in the Georgia State Patrol pursuant to the agency's internal policies and was executed in a neutral, nondiscriminatory manner. Accordingly, the roadblock comports with the requirements of the Fourth Amendment as enunciated by the Supreme Court, and defendant's motion to suppress should be DENIED.

**SO REPORTED AND RECOMMENDED** this 6th day of March, 2007.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA